# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>RANDALL LEE RANK,<br><br>    Defendant. | No. CR06-3011-LTS<br><br>**MEMORANDUM OPINION AND ORDER** |

## I. INTRODUCTION

This case is before me on defendant Randall Rank's motion (Doc. No. 68) to reduce sentence based on compassionate release. The Government has filed a response (Doc. No. 72) and Rank has submitted a reply (Doc. No. 73). Oral argument is not necessary. *See* Local Rule 7(c).

## II. BACKGROUND

On March 23, 2006, the Grand Jury returned an Indictment charging Rank with five counts: (1) conspiracy to manufacture and distribute 50 grams or more of methamphetamine (actual) and to distribute and possess with the intent to distribute 500 grams or more of methamphetamine after a conviction for a felony drug offense in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846 and 851 (2) two counts of manufacture and attempt to manufacture 5 grams or more of methamphetamine (actual) after a conviction for a felony drug offense in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 851 and (3) two counts of possession of Pseudoephedrine, knowing and having reasonable cause to believe that the Pseudoephedrine would be used to manufacture methamphetamine in violation of 21 U.S.C. § 841(c)(2). Doc. No. 2. On July 17, 2006, Rank pled guilty to Counts 1, 2 and 3. *See* Doc. No. 31. At Rank's

sentencing hearing on October 30, 2006, United States District Judge Mark W. Bennett calculated a guideline range of 235 to 293 months, based on a total offense level of 33 and a criminal history category of VI. Doc. No. 43; Doc. No. 46 at 8, 14, 17; Doc. No. 49-1. Because the Government had filed a 21 U.S.C. § 851 prior felony drug offense enhancement notice, Rank's mandatory minimum sentence was 240 months. Doc. No. 46 at 17, Doc. No. 49-1 at 2. Judge Bennett sentenced Rank to 240 months' imprisonment, followed by 10 years of supervised release. *See* Doc. No. 44.

On April 9, 2020, I denied Rank's pro se motion for a sentence reduction pursuant to the First Step Act because he was not eligible for relief. *See* Doc. No. 56. On August 3, 2020, I denied Rank's pro se motion (Doc. No. 59) for compassionate release because his rehabilitation alone was not an extraordinary and compelling reason for early release. *See* Doc. No. 61. On August 24, 2020, I appointed the Federal Public Defender to represent him. Doc. No. 67. On September 8, 2020, Rank filed an amended motion (Doc. No. 68), through counsel, for compassionate release.

According to the online Bureau of Prisons (BOP) inmate locator, Rank is currently at Greenville FCI and his projected release date is April 12, 2023.

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is extremely limited. One way a court may modify a sentence is through "compassionate release" as outlined in 18 U.S.C. § 3582(c)(1)(A), which was recently modified by the First Step Act of 2018 (FSA). *See* Pub. L. No. 115-391, § 603. In the past, 18 U.S.C. § 3582(c)(1)(A) permitted a court to reduce a defendant's term of imprisonment only upon the motion of the Director of BOP. The FSA modified § 3582(c)(1)(A) such that a defendant may now directly petition the court "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See Mohrbacher v. Ponce*, No. CV18-

2

00513, 2019 WL 161727, at *1 (C.D. Cal. Jan. 10, 2019) (discussing modifications made to § 3582(c)(1)(A) by the FSA); *see also United States v. Perez-Asencio*, No. CR18-3611, 2019 WL 626175, at *2–3 (S.D. Cal. Feb. 14, 2019).

If a defendant fully exhausts administrative remedies, the court may, upon motion of the defendant, reduce the defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, if the court finds that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . .

18 U.S.C. § 3582(c)(1)(A). Rank does not meet the requirements of § 3582(c)(1)(A)(ii). He is under 70 years of age and has not served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c). *See* Doc. No. 69. Accordingly, Rank's only possible avenue for relief is § 3582(c)(1)(A)(i).

The starting point in determining what constitutes "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) is the Sentencing Guideline discussing compassionate release issued by the United States Sentencing Commission. *See* U.S.S.G. § 1B1.13 (U.S. Sentencing Comm'n 2018); *see also United States v. Hall*, No. CR98-7, 2019 WL 6829951, at *3 (E.D. Ky. Dec. 13, 2019); *United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). The Guideline provides that extraordinary and compelling reasons exist in the following circumstances:

> (A) Medical Condition of the Defendant.—
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic

3

solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

This Guideline predates the FSA and has "not been amended to reflect that, under the FSA, a defendant may now move for compassionate release after exhausting administrative remedies." *Rivernider*, 2019 WL 3816671, at *2. Courts are split on whether the policy statement is binding because it predates the FSA's changes to 18 U.S.C. § 3582(c)(1)(A). A number of district courts have concluded that Guideline § 1B1.13 cmt. n.1 does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See, e.g.*, *United States v. Rodriguez*,

424 F. Supp. 3d 674, 681 (N.D. Cal. 2019); *United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019); *United States v. Fox*, No. CR14-03, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019); *United States v. Cantu*, 423 F. Supp. 3d 345, 352 (S.D. Tex. 2019). Other courts have concluded that extraordinary and compelling reasons exist only if they are included in the Guideline. *See, e.g.*, *United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019).

As I have previously stated, I agree with those courts that have found that although the Guideline provides helpful guidance on what constitutes extraordinary and compelling reasons, it is not conclusive given the recent statutory changes.[1] *See United States v.*

---

[1] The Eighth Circuit of Appeals has heretofore declined to expressly overrule the current version of § 1B1.13. But it has indicated that district courts should consider extraordinary and compelling reasons outside the strict confines of § 1B1.13. In a case in which the district court denied a defendant's compassionate release motion, the defendant argued the district court erred by relying on the § 1B1.13 policy statements. In declining to consider that issue, the Eighth Circuit noted that district court was clearly aware of the change of the law:

> While some courts adhere to "the pre-First Step Act policy statements," "[o]ther courts [have] ruled that the pre-First Step Act policy statements are inapplicable, and that a judge has discretion to determine, at least until the Sentencing Commission acts, what qualifies as 'extraordinary and compelling reasons.'" *Id*. (citing *United States v. Brown*, 411 F. Supp. 3d 446, 448–51 (S.D. Iowa Oct. 8, 2019)). . . .
>
> After analyzing whether Rodd satisfied the "extraordinary and compelling reasons" criteria set forth in § 1B1.13, the district court assumed that Rodd satisfied a more expansive definition of the phrase and analyzed the compassionate-release motion under 18 U.S.C. § 3553(a). Specifically, the court stated, "Even assuming Congress intended to expand the use of compassionate release with the First Step Act, the Section 3553(a) factors present at sentencing have not changed. Rodd does not qualify for compassionate release." *Id*.

*United States v. Rodd*, No. 19-3498, 2020 WL 4006427, at *4–5 (8th Cir. July 16, 2020). The Eighth Circuit then stated:

*Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020); ); *see also Rodriguez*, 424 F. Supp. 3d at 682 (Congress knew that the BOP rarely granted compassionate release requests prior to the FSA, and the purpose of the FSA is to increase the number of compassionate release requests granted by allowing defendants to file motions in district courts directly even after the BOP denies their request); *Brown*, 411 F. Supp. 3d at 451 (same).

## IV. DISCUSSION

### A. *Exhaustion of Administrative Remedies*

Rank requested compassionate release from the BOP on April 11, April 27 and May 11, 2020, based on his health conditions and COVID-19. Doc. No. 69 at 2 (citing Doc. No. 69-1). The warden denied his requests on July 5, 2020. *See* Doc. No. 65-1.

---

> We need not determine whether the district court erred in adhering to the policy statements in § 1B1.13. The district court knew its discretion. It expressly stated that "[e]ven assuming Congress intended to expand the use of compassionate release with the First Step Act, the Section 3553(a) factors present at sentencing have not changed" and, as a result, "Rodd does not qualify for compassionate release." *Rodd*, 2019 WL 5623973, at *4; *see also id*. ("[E]ven assuming a more expansive definition of 'extraordinary and compelling reasons' under the First Step Act, Rodd's Motion is denied."). In other words, the district court assumed that Rodd's health and family concerns constituted extraordinary and compelling reasons for compassionate release. Therefore, we need only determine "whether the district court abused its discretion in determining that the § 3553(a) factors weigh against granting [Rodd's] immediate release."

*Id*. at *6. In a footnote, the court also observed that "'[a]s the Sentencing Commission lacks a quorum to amend the U.S. Sentencing Guidelines, it seems unlikely there will be a policy statement applicable to [compassionate-release] motions brought by defendants in the near future.' *United States v. Beck*, 425 F. Supp. 3d 573, 579 n.7 (M.D.N.C. 2019)." *Id*. at *5 n.7; *see also United States v. Loggins*, No. 19-2689, 2020 WL 4375103, at *2 (8th Cir. July 31, 2020) (where the Eighth Circuit observed that § 1B1.13 does not reflect the current version of the compassionate release statute, but found no error because "[w]here the [district] court expressly considered post-sentencing rehabilitation (a circumstance not listed in § 1B1.13), the more natural inference is that the court did not feel constrained by the circumstances enumerated in the policy statement, but simply found that a non-retroactive change in [sentencing] law did not support a finding of extraordinary or compelling reasons for release.").

6

Counsel for Rank filed the instant motion (Doc. No. 68) for compassionate release on September 8, 2020. The Government points out that less than 30 days passed from BOP's denial to Rank's pro se motion (Doc. No. 59) for compassionate release (which I denied) but agrees that more than 30 days have passed between the warden's receipt (and denial) of Rank's requests and the motion now before me. *See* Doc. No. 72 at 10.

Section 3582(c)(1)(A) provides that a court may not modify a term of imprisonment except upon motion of the BOP or defendant "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Some district courts have held that a defendant can file a motion for compassionate release 30 days after the warden receives the administrative request only if the warden does not respond. If the warden does respond, those cases hold that a defendant must fully exhaust administrative remedies within the BOP and cannot file in court after 30 days. *See United States v. Mattingley*, No. 6:15-cr-0005, 2020 WL 974874, at *5 (W.D. Va. Feb. 28, 2020); *United States v. Bolino*, No. 06-cr-806 (BMC), 2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020).

Other courts, including this court, have found § 3582(c)(1)(A) to be unambiguous allowing a defendant to bring a motion after exhausting administrative rights to appeal within the BOP or waiting for the lapse of 30 days, "whichever is earlier." *See United States v. Burnside*, No. 18-CR-2068-CJW-MAR, 2020 WL 3443944, at *4-*7 (N.D. Iowa June 18, 2020) (quoting 18 U.S.C. § 3582(c)(1)(A)). I agree with Judge Williams that the statute does not require a defendant to exhaust administrative appeals following a denial from the warden or otherwise qualify the 30-day provision to apply only in the case of inaction by the warden. *Id.* at *7. This reading is consistent with Congress' intent of amending § 3582(c) to allow defendants to quickly and easily bring these motions before the court. *Id.*

Rank submitted his requests to the warden in April and May 2020 before filing his motion in this court in September 2020. *See* Doc. No. 69-1. Based on my reading of the statute, and because the Government does not object to consideration of the motion on exhaustion grounds, I find that Rank has exhausted his administrative remedies under 18 U.S.C. § 3582(c)(1)(A).

### B.     *Extraordinary and Compelling Reasons*

Rank argues his medical conditions of hypertension, abnormal liver function/fatty liver, obesity and type two diabetes with mellitus constitute an extraordinary and compelling reason for release due to the increased risk of complications he could face if he contracts COVID-19. *See* Doc. No. 69 at 7. He has submitted medical records from 2019 and 2020 demonstrating diagnosis and treatment for his medical conditions. *See* Doc. No. 69-2. In addition to his medical conditions, he argues his rehabilitation is another extraordinary and compelling reason for release. *See* Doc. No. 69 at 13-14.

#### 1.     *Health Conditions and COVID-19*

Rank was diagnosed with type two diabetes mellitus in January 2014. Doc. No. 69-2 at 57. In January and February 2019, Rank had good control of his diabetes and started a new medication for "cardioprotection." *Id.* at 36, 43. On June 11, 2019, his A1C[2] was 6.8. *Id.* at 17. In March 2020, his A1C was 8.9. *Id.* at 241. His A1C was also elevated in June 2020 when Rank was noncompliant with his medications. *Id.* at 177.

---

[2] "An A1C level above 8 percent means that your diabetes in not well-controlled and you have a higher risk of developing complications of diabetes." *A1C test*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643 (last visited Sept. 28, 2020).

In May 2019, Rank was diagnosed with "abnormal liver function." *Id.* at 131, 136. His providers have advised him he has a "fatty liver" and that he needs to lose weight to reverse it. *Id.* at 17.

Rank was diagnosed with hypertension in January 2012. *Id.* at 57. At his appointment in February 2020, Rank admitted he stopped taking his medication a few months prior and was counselled on compliance. *Id.* at 196. His blood pressure[3] readings in 2020 include:

- 1/3/2020 – 140/88
- 2/4/2020 – 140/98
- 2/18/2020[4] – 139/87
- 3/2/2020 – 140/82
- 3/13/2020 – 141/93
- 3/24/2020 – 126/83
- 6/29/2020 – 142/92

*Id.* at 207. In June 2020, Rank admitted he had not been compliant with his medications for "several months/weeks." *Id.* at 177. He stated his father was in the hospital and he had been dealing with that. The doctor noted Rank has a long-standing history of spotty compliance. He was advised of consequences of noncompliance with medications. *Id.*

---

[3] Normal blood pressure consists of a systolic (upper number) reading of less than 120 and a diastolic (lower number) reading of less than 80. Hypertension is identified when the systolic number is above 130 and the diastolic number is above 80. *See Understanding Blood Pressure Readings*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings (last visited Sept. 28, 2020).

[4] On February 18, 2020, Rank refused weekly blood pressure checks. Doc. No. 69-2 at 263.

On October 13, 2019, Rank was taken to the ER for chest pain. *Id.* at 5, 93-94. A CT scan revealed mild paraseptal emphysema[5] and some pulmonary nodules, which the radiologist noted appeared to be stable since 2016 and were considered benign. *Id.* at 113. The doctor recommended follow-up in one to three months depending on risk factors for lung cancer. *Id.* at 96. A chest x-ray also revealed hyperinflation of the lungs. *Id.* at 99. Rank was diagnosed with chest pain and discharged with a pamphlet on angina. *Id.* at 108-11.

In March 2020, Rank saw a pulmonologist for a cough and shortness of breath. *Id.* at 187, 250-54. A radiologist noted the chest x-ray revealed the pulmonary nodules did not appear pathologically enlarged and were considered stable and benign. *Id.* at 259. In May 2020, Rank had a follow up with pulmonology to discuss his CT scan results. The pulmonologist recommended a sleep study due to risk factors and increased risk for stroke, heart failure and atrial fibrillation with untreated sleep apnea. *Id.* at 185.

While obesity is not specifically mentioned in his medical records, it appears Rank may be considered obese based on his height and weight.[6] His doctors frequently encourage him to lose weight in treating his diabetes and fatty liver. *Id.* at 17, 36, 43.

The BOP Health Services performed a chart review on June 29, 2020 to determine whether a reduction in sentence was warranted for medical reasons. *Id.* at 181. The

---

[5] "Paraseptal emphysema is characterized by swelling and tissue damage to the alveoli. Alveoli are tiny air sacs that allow oxygen and carbon dioxide to flow through your airways." *Overview: Subcutaneous Emphysema, Bullous Emphysema, and Paraseptal Emphysema*, Healthline, https://www.healthline.com/health/copd/subcutaneous-emphysema (last visited Sept. 28, 2020).

[6] Rank is six feet tall. Doc. No. 69-2 at 155. Rank's weight on June 29, 2020 was 276 pounds. *Id.* at 177. This equates to a body mass index (BMI) of 37. *See Obesity*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/obesity/symptoms-causes/syc-20375742 (last visited Sept. 28, 2020) (providing obesity is diagnosed when an individual's BMI is 30 or higher and that BMI is calculated by dividing weight in pounds by height in inches squared and multiplying by 703).

10

doctor noted Rank does not have a terminal diagnosis with life expectancy under 18 months, does not have an incurable progressive illness and is able to perform activities of daily living. *Id.* While he does have chronic illnesses, these require only conventional treatment and Rank is under the age of 65. The doctor determined Rank did not qualify for a reduction in sentence based on medical reasons. *Id.* at 181, 247.

The Centers for Disease Control and Prevention (CDC) lists categories of people with underlying medical conditions who *are* at an increased risk and categories of people who *might* be at higher risk of severe illness from COVID-19.[7] Rank has two conditions that place him at an increased risk – type two diabetes mellitus and obesity – and two that might place him at an increased risk – hypertension and liver disease.

The Government argues that the mere existence of the COVID-19 pandemic does not, by itself, provide a basis for a sentence reduction. Doc. No. 72 at 13. It acknowledges, however, that if an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the "extraordinary and compelling reasons" standard. *Id.* at 14. It argues that, as part of my analysis, I should consider whether the inmate is more likely to contract COVID-19 if released than if he remains incarcerated. *Id.* at 14-15.

Here, the Government argues that Rank's facility has only four positive inmate cases. *Id.* at 15. It notes that Rank is 55 years old and is at medical Care Level 2, which is for stable chronic care, meaning his conditions are stable, but require regular clinical evaluations. *Id.* at 16. The Government acknowledges that Rank's obesity and type two diabetes mellitus are definitive risk factors and his hypertension is a possible risk factor

---

[7] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Sept. 28, 2020).

as identified by the CDC. For this reason, it admits Rank appears to be at a higher risk of complications if he contracts COVID-19. *Id.* at 17. The Government notes, however, that Rank's proposed release plan of residing with his parents in Fort Dodge, Iowa, may present a greater risk of exposure based on current statistics for Webster County, Iowa. *Id.* It also notes that Rank's medical conditions are being adequately treated, monitored and controlled in the BOP. *Id.* at 18. The Government states it would not object to a conclusion that Rank has shown extraordinary and compelling circumstances, but requests that I consider Rank's release plan and the fact that his conditions are well-controlled within the BOP. *Id.* at 18-19.

While the BOP has taken many measures to prevent the transmission of COVID-19 among its inmate population,[8] the virus has nonetheless spread through many BOP facilities. As of September 28, 2020, of the 126,726 inmates in BOP-managed institutions and 14,263 in community-based facilities, 14,624 have tested positive.[9] This corresponds to an infection rate across BOP facilities of 10 percent. The national infection rate is 2.1 percent.[10] As of September 28, 2020, 76 inmates (6.1 percent of the

---

[8] According to the BOP's website, those measures have included limiting inmate movement within each facility and between facilities, suspending visits, suspending staff training and travel, screening staff and inmates for COVID-19 symptoms and modifying operations to maximum social distancing to the extent possible. *BOP Implementing Modified Operations*, Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Sept. 28, 2020).

[9] *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Sept. 28, 2020).

[10] This is based on 7,059,087 COVID-19 cases and a population of 330,368,078. *See CDC COVID Data Tracker*, CDC, https://www.cdc.gov/covid-data-tracker/#cases (last visited Sept. 28, 2020); *U.S. and World Population Clock*, United States Census Bureau, https://www.census.gov/popclock/ (last visited Sept. 28, 2020).

total inmate population) have tested positive for COVID-19 at Rank's facility – FCI Greenville.[11] There have been no deaths.

I agree with the Government that the "extraordinary and compelling reasons" issue here is somewhat of a close call. Rank has multiple health conditions identified by the CDC that pose an increased risk of complications or might pose an increased risk of complications if he contracts COVID-19. Numerous courts have held that a defendant's health condition(s) that increases his risk of serious illness from COVID-19 and the presence of COVID-19 within BOP facilities constitute extraordinary and compelling reasons for compassionate release. *See United States v. Conner*, No. CR07-4095-LTS, 2020 WL 3053368, at *7 (N.D. Iowa June 8, 2020) (collecting cases). On the other hand, his facility appears, at this point, to have avoided a severe outbreak as experienced by other BOP facilities and his health conditions appear to be well-controlled within the BOP. Nonetheless, the virus is present at FCI Greenville and Rank's ability to provide self-care for his conditions in that environment is substantially diminished.

Rank's release plan (Doc. No. 69-3) includes living with his parents in Fort Dodge, Iowa. His father was diagnosed with congestive heart failure in June 2020 and incurred a blood infection, for which he is receiving antibiotic infusions. Doc. No. 69-3. Fort Dodge is located in Webster County, Iowa, which has a population of approximately 35,904.[12] There have been 1,275 positive cases in Webster County, corresponding to an infection rate of 3.5 percent.[13] While Webster County, Iowa, is on the higher end of positive cases in Iowa, I find that Rank is better able to provide self-

---

[11] *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Sept. 28, 2020). FCI Greenville has a total inmate population of 1,233. *See* https://www.bop.gov/locations/institutions/gre/.

[12] *See* https://www.census.gov/quickfacts/webstercountyiowa (providing population estimate of 35,904 as of July 1, 2019).

[13] The percentage of positive cases based on the past 14-day average is 9.2 percent. *See* https://coronavirus.iowa.gov/pages/case-counts (last visited Sept. 28, 2020).

13

care living with his parents than in the BOP. *See* USSG § 1B1.13, cmt. n.1(A)(ii) (noting the standard is met if the defendant is suffering from a serious physical or medical condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."). Further, the overall rate of infection within the BOP is much higher than in the general population of the United States and higher than Webster County, Iowa. I find that Rank is somewhat less likely to contract COVID-19 on release than if he stayed in the BOP. Overall, I find that Rank's multiple health conditions provide an extraordinary and compelling reason for release.

### 2. *Rehabilitation*

Rank also asks me to consider his rehabilitation as an extraordinary and compelling reason for release. Rank has submitted a letter (Doc. No. 69-4) in support of clemency from Judge Bennett and 21 letters (Doc. No. 69-5; Doc. Nos. 73-1 through 73-7) from BOP staff. Rank acknowledges that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). However, he argues that rehabilitation in combination with other factors can support compassionate release.

Based on the text of § 994(t), and absent any contrary argument from the Government, I agree that a defendant's rehabilitation may be considered in deciding whether extraordinary and compelling reasons are present, if other factors are also present. *See United States v. Campbell*, No. CR03-4020-LTS, 2020 WL 4432845, at *5 (N.D. Iowa July 31, 2020) (citing cases in support of this proposition). As discussed above, Rank has medical conditions identified by the CDC as increasing his risk for severe illness from COVID-19. Because other factors are present, I will consider his rehabilitation.

14

Rank's rehabilitation is impressive. Many BOP staff have indicated Rank is the first inmate for whom they have written a letter of support during their years of employment with BOP. Their comments include:

- Mr. Rank has always chose[n] to do the hard right rather than the easy wrong while conducting himself here at FCI Greenville. He has always maintained above and beyond the standards set forth in the policies provided by the Bureau of Prisons. He always interacts with other inmates with encouragement and with a positive attitude in an environment where being positive is not all that common. Doc. No. 69-5 at 1.

- As Rank has aged in prison he has not lost his good attitude and desire to be positive, which has resulted in me witnessing several occasions of him mentoring younger inmates about how to stay out of trouble and to try and improve themselves during their incarceration. Doc. No. 69-5 at 2.

- In the last 10 years I have watched him work his way up from Orderly (performing janitorial duties) to his current Grade 1 (a position that demands the highest degree of accountability, with the highest pay) . . . As I've watched inmate Rank work his way up, I have seen three entire crews come and go, with inmate Rank being the one "constant" that can carry the load. Every day he shows up, works hard and is the last one to leave. His work ethic is unmatched and his personality is always positive. Doc. No. 69-5 at 3.

- Rank has expressed a great deal of remorse over his offenses and the effect it has had on those around him, which is a rare sight in this environment. Doc. No. 69-5 at 5.

- I believe, that if given a second chance and granted . . . early release, not only would he not reoffend, he would take full advantage of the opportunity to improve his life, reconnect with family and be a positive and productive member of his community and society as a whole. Doc. No. 69-5 at 8.

- Ever since arriving at Greenville, Rank has been very respectful to staff and other inmates. He has never received any disciplinary infractions. Doc. No. 69-5 at 12.

- Mr. Rank is what staff here would consider a "model inmate." I have no doubt that he will go on to great things after his time here. Mr. Rank has shown every attribute needed to be successful in today's world. He has respect, great

15

attitude, is responsible, caring, work ethic, and integrity. Doc. No. 73-3.

The Government even remarks how striking it is that "despite having served 174 months in prison, defendant has no disciplinary violations record." Doc. No. 72 at 20 (citing Doc. No. 72-2). If there was ever a case in which rehabilitation may be considered, along with other factors, to show extraordinary and compelling circumstances, this is it. It is clear that Rank has made a positive impression on those he encounters in the BOP through his positive attitude, work ethic and remorse for criminal actions. Those individuals are confident in Rank's ability to be a productive and law-abiding citizen upon release. I have no reason to doubt their assessment.

In sum, I find that the combination of Rank's health conditions, when viewed in the context of the current COVID-19 pandemic and his impressive rehabilitation efforts, constitute extraordinary and compelling reasons for release. Therefore, I will consider whether the remaining factors support granting his motion.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline § 1B1.13(2) provides that compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Additionally, § 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before granting a motion for compassionate release. Section 3553(a) requires that I consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
>
> > (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission . . .;]
>
> (5) any pertinent policy statement [issued by the Sentencing Commission . . .']
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The nature and circumstances of the offense included the manufacture and distribution of methamphetamine, including at least 150 grams of actual/pure methamphetamine and five pounds of mixed methamphetamine. *See* Doc. No. 46 at 4-6. Rank received a sentencing enhancement for his role in the offense. *Id.* at 8. This is a serious offense that weighs against release.

Rank's criminal history consists of a few minor misdemeanor offenses and the following felony offenses: delivery of methamphetamine in 2003, possession of methamphetamine with a prior conviction in 2004, possession of a controlled substance (third degree) in 2004 and eluding in 2004. It does not include crimes of violence. *See* Doc. No. 46 at 9-14. As the Government notes, while this history is somewhat lengthy, it is also dated and does not weigh strongly in favor of continued detention. Doc. No. 72 at 19-20.

With regard to the need for the sentence imposed, Rank has served about 73 percent (174 months) of his 240-month sentence. The Government notes he is likely to be released to home detention or a residential reentry center as soon as 2022 or 2023 and that he will serve a 10-year term of supervised release once released. *Id.* at 20. Rank

has a suitable plan on release. He plans to reside with his parents in Fort Dodge, Iowa. Doc. No. 69-3. His mother is able to pick him up from the BOP and notes the community has free or income-based services available for medical, mental health and substance abuse treatment. *Id.* Rank also has two job opportunities available at an automotive repair shop and at a grain elevator. *Id.* Both employers have indicated Rank's work would be welcome. *Id.*

The Government acknowledges that the "combination of percentage of time served, lack of violent criminal history, and absolutely no conduct related violations while in BOP custody, all support a finding that the § 3553(a) factors support release." *Id.* at 20. I agree. Rank has served 14.5 years in prison and has demonstrated a successful rehabilitation while in the BOP. The time he has already served satisfies the goals of sentencing. As such, I find that Rank is eligible for compassionate release and will grant his motion.

## V.  *CONCLUSION*

For the foregoing reasons:

1. Defendant Randall Lee Rank's motion (Doc. No. 68) for compassionate release is **granted**. However, execution of this order is **stayed** for fourteen (14) days to allow the Bureau of Prisons and United States Probation an opportunity to make the necessary arrangements for Rank's release.

2. Based on the stay of execution described in the preceding paragraph, Rank's term of imprisonment is hereby **reduced to time served as of October 13, 2020.**

3. All other aspects of the judgment (Doc. No. 44) remain in effect, including those related to Rank's term of supervised release.

4. The Clerk of Court shall provide a copy of this order to the Probation Office and the institution where Rank is incarcerated.

18

**IT IS SO ORDERED.**

**DATED** this 29th day of September, 2020.

_____
Leonard T. Strand, Chief Judge